1

2

3                    UNITED STATES DISTRICT COURT

4                         DISTRICT OF NEVADA

5                                * * *

6    DEBELL WINDOWS SYSTEMS, INC.,          Case No. 3:20-cv-00420-MMD-WGC

7                            Plaintiff,                ORDER

8         v.

9    DABELLA EXTERIORS, LLC, *et al.*,

10                          Defendants.

11   **I.    SUMMARY**

12        In this trademark infringement case, Plaintiff DeBell Window Systems, Inc. seeks

13   to preliminarily enjoin Defendants Dabella Exteriors, LLC and Damselfly Improvement,

14   LLC, doing business as DaBella, from using their DaBella name and mark in Northern

15   Nevada to promote or market their business in any way—including on Defendants'

16   website.[1] (ECF No. 8 (the "Motion").)[2] The Court held a hearing on the Motion on August

17   26, 2020, where Plaintiff's co-owner Melissa D'Andrea testified, as well as Defendants'

18   regional manager Daniel Lowenson. (ECF Nos. 31 ("Hearing"), 43 (hearing transcript).)

19   As further explained below, the Court will grant the Motion because Plaintiff made a

20   sufficient preliminary showing it owns a federally registered trademark, and that Defendant

21   is now using a confusingly similar junior mark in the Northern Nevada area, but will limit

22

23   _____

24        [1]Plaintiff withdrew its original request for an injunction that covered the entire state
     of Nevada, Truckee, California, and South Lake Tahoe, California, at the Hearing. Plaintiff
     also clarified it was not seeking to have Defendants remove the DaBella name from their
25   nationwide website, but maintains Defendants should change the name on their Nevada-
     specific website and rename their Nevada operation. (ECF No. 43 at 114.)

26
         [2]Plaintiff concurrently filed a motion for temporary restraining order ("TRO Motion")
27   (ECF No. 7) with its Motion, and Defendant filed a motion to seal along with its response
     to the Motion (ECF No. 18). The Court addressed those two motions at the Hearing. (ECF
28   No. 31.) In addition, and separately, Plaintiff's Motion cites to exhibits to its TRO Motion.
     Thus, the Court will cite to exhibits to Plaintiff's TRO Motion.

the scope of Plaintiff's requested injunction because it finds Plaintiff's requested injunctive relief overbroad. This order also addresses two motions Plaintiff filed after the Hearing seeking to supplement the Motion.

## II.    BACKGROUND

Except where stated, the following facts appear without dispute in the preliminary injunction record.

### A.  Plaintiff and Its Mark

Plaintiff is a home-improvement business that has been operating in Reno, Nevada, and the surrounding area, since 1990. (ECF No. 8 at 4.) Working with a graphic designer, Plaintiff's founder arbitrarily chose the name DeBell and the Debell logo for his business around the time of its founding. (*Id.*) The logo looks like this:



(*Id.*) Plaintiff "sells windows, doors, siding, roofing, insulation, bathtubs, and exterior protection and uses its team of independent contractors to provide installation services." (*Id.* at 4.) Plaintiff operates out of a showroom in Reno, and also sends salespeople to customers' houses. (*Id.* at 5.)

That said, Plaintiff's federally registered mark is not for the logo—it is for the word "DeBell," in any format or stylization. (*Id.*; *see also* ECF No. 7-4.) Plaintiff's federal registration issued on June 29, 1999. (ECF No. 7-4 at 2.) It covers: "Construction services, namely, planning, laying out, and custom instillation of window units and sun and patio rooms…" (*Id.*) Plaintiff also maintains it has common law trademark rights in "DeBell" because of its use in commerce for the last 30 years or so. (ECF No. 8 at 5.)

///

///

///

Plaintiff has since its founding, and continues to, advertise in Reno and the surrounding area. (*Id.*; *see also* ECF No. 7-1 at 3-5.)[3] Plaintiff advertises on television, in print, and in the local RedPlum circular. (ECF No. 7-1 at 3-5.) Plaintiff also advertises via shopping-cart inserts, direct mail, and its website, debellinc.com. (*Id.*) Plaintiff estimates it is on track to spend more than $1 million on advertising in 2020 alone. (*Id.* at 4.) That said, much of Plaintiff's business comes through word-of-mouth. (*Id.* at 4-5.) Many of Plaintiff's customers are older, and refer their children and grandchildren to Plaintiff. (*Id.*) Plaintiff has a customer list of over 7,500 prior customers. (*Id.* at 4.)

### B. Defendants and Their Mark

Defendants were founded in Oregon in 2011. (ECF No. 17 at 2, 9.) Defendants are also in the home-remodeling business, both selling and offering installation of windows, roofing, and other products. (*Id.* at 2.) Defendants came up with the name DaBella by combining the names of the owners' twins, David and Isabella. (*Id.*) Unlike Plaintiff, Defendants have been rapidly expanding since 2011, moving from Oregon into a number of other states. (*Id.*) As most pertinent to this case, Defendants expanded into Nevada earlier in 2020. (*Id.* at 3.) Defendants' expansion into Nevada led to the conflict here.

Back in 2013, Defendants registered two trademarks they have since let lapse: "DaBella Exteriors" and "The DaBella Difference!" (*Id.* at 2.) In 2018, Defendants rebranded and created the mark at issue in this case: the word "DaBella" with a greenish butterfly icon next to it. (*Id.*) Defendants obtained federal registration for their trademark in April 2019, and Plaintiff did not oppose that registration. (*Id.*; *see also* ECF No. 16-17.) "The mark consists of a butterfly to the left of the word 'DABELLA'" (ECF No. 16-17 at 2.) Defendants' registered mark looks like this:



---

[3]ECF No. 7-1 is the declaration of Plaintiff's co-owner William D'Andrea. His wife, Mrs. D'Andrea, offered confirmatory testimony at the Hearing. (ECF Nos. 31, 43.)

(ECF No. 17 at 2-3.) Defendants' mark covers: "residential remodeling services, namely, installation of roofing, siding, windows doors, and gutter systems[.]" (*Id.*)

Defendants also advertise heavily, though their strategy is more focused on the internet than Plaintiff's. (ECF No. 17 at 3.) Defendants say they have spent more than $48 million on marketing and advertising since 2011. (*Id.*) They also say their rebranding effort connected to the logo displayed above cost them about $1.8 million. (*Id.*) Defendants conduct their "marketing in Nevada through the internet, Facebook, canvassing and telemarketing." (*Id.*) Mr. Lowenson offered generally confirmatory testimony at the Hearing.

### C.  The Parties' Interactions

According to testimony from both parties' witnesses at the Hearing and the parties' briefing, the parties became aware of each other earlier this year, after Defendants expanded into Plaintiff's market. Plaintiff says it became aware of Defendants because its representatives had several interactions with customers where Plaintiff's representatives eventually determined that those customers had confused DeBell for DaBella. (ECF No. 8 at 7-11.) This prompted Plaintiff's co-owner Mrs. D'Andrea to write a Yelp review on Defendants' Yelp page to the effect that "DaBella was wrongly trading on DeBell's name and reputation and that it was unlawfully using the confusingly similar DaBella name." (*Id.* at 11.) Defendants say this is the first time they had heard of Plaintiff, and attached a copy of Mrs. D'Andrea's conversation with one of Defendants' representatives as an exhibit to their response to the Motion. (ECF Nos. 17 at 3-4, 16-7.)

Following the Yelp conversation in March 2020, and also following another alleged incident of direct consumer confusion, Mrs. D'Andrea requested that the Nevada State Contractors Board force Defendants to stop using the DaBella name in May 2020. (ECF No. 8 at 11.) A few days later, Plaintiff retained litigation counsel. (*Id.*) On May 26, Plaintiff's counsel sent Defendants a cease-and-desist letter. (*Id.*) The letter included a response deadline of June 1, 2020. (*Id.*) Not having received a response to its letter, Plaintiff initiated

1  this suit in state court on July 8, 2020. (*Id.* at 12.) Defendants removed the case to this

2  Court on July 13. (*Id.*) Plaintiff filed its Motion on July 15. (*See generally id.*)

3       Plaintiff's Complaint contains five claims: (1) trademark infringement under the

4  federal Lanham Act, specifically 15 U.S.C. § 1114(1)(a); (2) unfair competition under the

5  Lanham Act, specifically 15 U.S.C. § 1125(a)(1)(A); (3) cancellation of Defendants'

6  trademark registration under 15 U.S.C. § 1064; (4) common-law trademark infringement;

7  (5) and common-law unfair competition. (ECF No. 1-2 at 13-17.) Plaintiff's Motion focuses

8  entirely on its first claim, for trademark infringement under the Lanham Act. (ECF No. 8.)

9  Plaintiff clarified at the Hearing it seeks a preliminary injunction on its first and fourth claims

10  for trademark infringement, as the applicable legal standards are basically the same for

11  both the federal and common law trademark infringement claims. (ECF No. 43 at 112-13.)

12  This order thus only addresses trademark infringement.

13  **III.   DISCUSSION**

14       The Court first addresses Plaintiff's post-hearing briefing, then Defendants'

15  argument that Plaintiff's claim is barred by the doctrine of laches—the Court finds it is

16  not—and then addresses each component of Plaintiff's Motion.

17       **A. Post-Hearing Briefing**

18       At the Hearing, the Court raised the possibility of preliminarily requiring Defendants

19  to include some sort of disclaimer on their marketing materials instead of granting Plaintiff

20  the broad injunction it sought in its briefing, and both parties responded to the Court's

21  questions. (ECF No. 31.) Neither party had previously briefed whether a disclaimer would

22  be a suitable compromise.

23       After the Hearing, Plaintiff filed a motion for leave to file supplemental authorities

24  regarding the Court's disclaimer proposal. (ECF No. 33.) The Court granted this motion

25  by minute order because the parties had not previously had an opportunity to brief the

26  disclaimer issue, and gave Defendants the opportunity to respond. (ECF No. 34.)

27  Defendants filed a response. (ECF No. 39.)

28  ///

1    Later the same day that Plaintiff filed its motion for leave to file supplemental

2    authorities on the disclaimer issue, Plaintiff filed another motion for leave to supplement

3    the evidentiary record of its Motion with an additional instance of consumer confusion, and

4    additional evidence of Plaintiff's use of the DeBell mark in commerce. (ECF No. 35

5    ("Supplemental Evidence Motion").) Defendants filed a response to that motion (ECF No.

6    38), and Plaintiff filed a reply (ECF No. 40). As the Court has not yet ruled on the

7    Supplemental Evidence Motion, it does so here.

8         The Court will deny the Supplemental Evidence Motion because it is cumulative

9    and unnecessary. As further explained below, the evidence Plaintiff submitted with its

10   Motion and at the Hearing is sufficient to establish both use in commerce of the DeBell

11   mark and instances of actual confusion. The evidence Plaintiff seeks to introduce through

12   the Supplemental Evidence Motion is therefore cumulative and unnecessary. Relatedly,

13   and as also explained below, the Court has been consistently unpersuaded by

14   Defendants' argument at the Hearing that the testimony of Plaintiff's owners (both written

15   and oral) is not evidence. Plaintiff's Supplemental Evidence Motion—at least in part—

16   appears calculated to further rebut that argument. But because the Court found that

17   argument unpersuasive before Plaintiff even filed the Supplemental Evidence Motion, the

18   evidence Plaintiff offers in the Supplemental Evidence Motion is unnecessary for that

19   additional reason. In sum, the Supplemental Evidence Motion (ECF No. 35) is denied.

20   **B.  Laches**

21        Defendants argue that Plaintiff cannot establish irreparable harm because it waited

22   to move for a preliminary injunction, invoking the doctrine of laches. (ECF No. 17 at 6-9.)

23   Perhaps out of an abundance of caution, Plaintiff interprets Defendants' argument

24   broadly—that Plaintiff's case is barred by laches, and replies that it is not. (ECF No. 21 at

25   3-5.) Reflecting that Defendants' argument is unclear, and responding to the fact Plaintiff

26   interpreted it more broadly, the Court addresses laches as a threshold issue.

27        "Laches is an equitable time limitation on a party's right to bring suit ... [and] is a

28   valid defense to Lanham Act claims." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d

1126, 1138 (9th Cir. 2006) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002)). "[I]n determining the presumption for laches, the limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action." *Jarrow*, 304 F.3d at 838.

The parties' key dispute here is when Plaintiff should have known about its trademark infringement cause of action. Defendants argue Plaintiff should have known about the DaBella mark from the date it was registered (in 2019), but then go on to argue Plaintiff should have been aware of Defendants' alleged infringement from 2013—when Defendants registered two trademarks they have since let lapse: "DaBella Exteriors" and "The DaBella Difference!" (ECF No. 17 at 6-9.) Plaintiff persuasively replies this argument does not follow, both because Defendants allowed those marks to be cancelled, so the laches clock should have started in 2019 when Defendants registered the DaBella mark, and Defendants are otherwise incorrect because Plaintiff only became aware of Defendants' use of the DaBella mark in March 2020, shortly after Defendants entered the Nevada market for the first time. (ECF No. 21 at 3-5.) The Court agrees with Plaintiff.

To start, Defendants' argument is unpersuasive because it attempts to start the laches clock with two cancelled trademarks not at issue in this case beyond showing that Defendants have used some version of a phrase including the word 'DaBella' since 2011. (ECF No. 17 at 6-9.) As Plaintiff argues, even if one accepts Defendants' incorrect premise that constructive notice through registration always triggers the beginning of a laches period, the DaBella mark registered in 2019 is the mark at issue here, not the cancelled marks registered in 2013. (ECF No. 21 at 5.) Defendants' argument based on the cancelled marks registered in 2013 is thus a red herring.

Moreover, the Court agrees with Plaintiff that Defendants' view of laches is too rigid. Registration does not start the laches clock running in every case. Instead, it starts running when Plaintiff knew or should have known about its cause of action. *See Reno Air Racing*, 452 F.3d at 1138. This flexible inquiry is "grounded in the fact that laches penalizes inexcusable dilatory behavior; if the plaintiff legitimately was unaware of the defendant's

conduct, laches is no bar to suit." *Id.* at 1139. And that appears to be the case here. Plaintiff argues it was not aware of Defendants until March 2020, and Defendants do not proffer any evidence or argument to the contrary. (ECF Nos. 8, 17, 43.) Defendants only argue that Plaintiff should have known about Defendants earlier[4]—either by monitoring the trademark register or the internet. (ECF No. 17 at 6-9.) That imposes too heavy a burden on Plaintiff. The Court instead agrees with Plaintiff any laches period only began running in this case when it had undisputed, actual notice of Defendants' allegedly infringing use of the DaBella mark—March 2020. And since March was not so long ago, laches does not bar Plaintiff's case.

Two cases proffered by Plaintiff further illustrate why Plaintiff's position is more persuasive than Defendants on this laches issue. Both cases are partially about Reno, which is appropriate given that Plaintiff is well established in this area, but not well-known elsewhere. In *Reno Air Racing*, the Ninth Circuit found that laches did not bar the plaintiff's trademark infringement claim against a seller of T-Shirts and other merchandise that used the plaintiff's logo without authorization, even though he had sold a small amount of infringing merchandise for years. *See* 452 F.3d at 1128-29, 1138-39. The Ninth Circuit noted there was no evidence the plaintiff was aware of the defendant's allegedly infringing conduct before 2000, when the plaintiff attempted to contact the defendant, and further noted that the earliest the plaintiff should have known about the defendant was the year before, when the defendant began selling his infringing merchandise right outside the gates of the plaintiff's air show. *See id.* at 1139. Thus, in *Reno Air Racing*, the Ninth Circuit used a commonsense approach to laches that focused on the defendant's geographic proximity to the plaintiff's business activity.

Similarly, in *Great Basin Brewing Co. v. Healdsburg Brewing Co.*, Case No. CV-N-97-161-ECR, 1997 WL 745035 (D. Nev. Oct. 3, 1997), Judge Reed of this District rejected

---

[4]But as noted, Defendants apparently were not aware of Plaintiff either, despite their entry into the Nevada market.

a laches argument and issued a preliminary injunction in an analogous trademark case. The plaintiff, a Reno brewery, sold a beer called Wild Horse Ale, but only on tap at its brew pub in the Reno area. *See id.* at *1. The defendant, a brewery in Northern California, also sold a beer called Wild Horse, but in bottles, primarily to distributors in Northern California, but also one in Reno, and one national direct mail distributor. *See id.* The plaintiff was the senior user of the mark. *See id.* Judge Reed rejected the defendant's laches argument within the likelihood of irreparable harm prong of the preliminary injunction analysis because, while the plaintiff had been aware of the defendant's allegedly infringing use for some time, the plaintiff filed the case soon after it learned that the defendant had sold some of the allegedly infringing beer into the Reno area. *See id.* at *7-*9. Judge Reed ultimately granted the plaintiff a preliminary injunction geographically limited to Nevada, where the plaintiff's beer was well-known, and which did not cover California, where the defendant's beer was better-known. *See id.* at *9-*10.

Both of these cases suggest that the laches triggering date should be the date Defendants moved into the Northern Nevada market. There is no dispute this was in early 2020. (ECF No. 17 at 3.) Plaintiff's co-owner contacted Defendants in late March, and Plaintiff eventually filed suit in July, with escalating actions in between. Plaintiff's case is not barred by laches.

### C. Motion

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest. *See id.* at 20. The Court addresses each of the factors in turn.

### 1. Likelihood of Success on the Merits

To establish a likelihood of success on the merits of a trademark infringement claim, the plaintiff must establish that she is "(1) the owner of a valid, protectable mark, and (2)

that the alleged infringer is using a confusingly similar mark." *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007). While it appeared to the Court from reviewing the parties' briefing they did not dispute the ownership or validity of Plaintiff's mark for purposes of this Motion, Defendants argued at the Hearing Plaintiff has not established it used its mark in commerce. (ECF No. 43 at 128-35.) To the extent Defendants intended that argument as an attack on the validity or ownership of Plaintiff's mark, the Court will address it here before moving on to determine whether the two marks are likely to cause confusion in the marketplace.

Defendants' argument is that Plaintiff has not proffered evidence it has ever used its mark in commerce. (*Id.*) Plaintiff responded at the Hearing by pointing to the declaration of one of its owners, Mr. D'Andrea, and the confirmatory testimony of its other owner, Mrs. D'Andrea. (*Id.* at 147.) Plaintiff also responded that declarations and testimony are evidence. (*Id.*) The Court agrees with Plaintiff.

As a general matter, testimony and declarations are evidence. *See, e.g.*, *U.S. v. Black*, 543 F. App'x 664, 672 (9th Cir. 2013) ("The statement was supported by evidence because [the witness] was a percipient witness, and his testimony *is* evidence.") (emphasis in original); *see also Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1248, 1251 (9th Cir. 2013) (stating the Court "permissibly relied on the declaration" of one of the parties' general managers in considering a motion for a preliminary injunction in a trademark case, though reversing and remanding because "the record fails to support a finding of likely irreparable harm"). Thus, Defendants' argument that Plaintiff presented no evidence of its mark's use in commerce is simply wrong.

Turning to Plaintiff's proffered evidence, Mr. D'Andrea writes in his declaration that Plaintiff has extensively advertised, marketed, and promoted the DeBell mark, and has spent millions on it. (ECF No. 7-1 at 4.) He says Plaintiff has advertised on television, in print, in the RedPlum circular, and via both shopping cart inserts and direct mail. (*Id.*) He says Plaintiff is on track to spend more than $1 million on advertising this year alone, and enjoys name recognition through word-of-mouth. (*Id.* at 4-5.) His wife Mrs. D'Andrea

offered confirmatory testimony at the Hearing. (ECF No. 43.) The Court finds Mr. D'Andrea's declaration in conjunction with Mrs. D'Andrea's testimony provide sufficient evidence that Plaintiff has used—and continues to use—the DeBell mark in commerce.[5]

Moving on, the Ninth Circuit uses the non-exhaustive eight factor *Sleekcraft* test for determining likelihood of consumer confusion: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 & n.11 (9th Cir. 1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003). "Some *Sleekcraft* factors are much more important than others, and the relative importance of each individual factor will be case specific." *M2 Software, Inc., v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (quotation marks and citation omitted). "In essence, the test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Id.* (citations and brackets omitted).

Though Plaintiff does not explicitly specify either way, Plaintiff appears to allege forward confusion between Plaintiff and Defendants' marks. (*See generally* ECF No. 1-2.) "In the usual [forward] infringement case," a court must determine "whether [the] junior user is palming off its products as those of the senior user. Would a consumer who finds a running shoe marked Mike be bamboozled into thinking that it was manufactured by

---

[5]Moreover, to the extent Defendants argue the Court should discount Plaintiff's evidence because it is self-serving, the Court declines to do so. Absent any evidence Mr. D'Andrea is lying—and Defendants have not proffered any—the Court must assume Mr. D'Andrea's statements regarding Plaintiff's use of its mark in commerce in his sworn declaration are true. (ECF No. 7-1 at 6.) Similarly, Mrs. D'Andrea was sworn in at the Hearing before giving her testimony. (ECF No. 43 at 6.) The Court therefore rejects Defendants' apparent baseless attack on the D'Andreas' credibility.

1  Nike?" *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129-30 (9th Cir.
2  1998).

3  **a.   Factor 1:  Strength of the Mark**

4  "The more likely a mark is to be remembered and associated in the public mind with
5  the mark's owner, the greater protection the mark is accorded by trademark law."
6  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) (citation omitted).
7  "The strength of the trademark is evaluated in terms of its conceptual strength and
8  commercial strength." *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d
9  1063, 1078 (N.D. Cal. 2012) (citation omitted). Therefore, the Court considers the
10 conceptual and commercial strength of Plaintiff's mark.

11 **i.   Conceptual Strength**

12 "The conceptual strength of a mark refers to its categorization on the continuum of
13 'genericness' to arbitrariness, with arbitrary marks being entitled to the highest degree of
14 protection from infringement." *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp.
15 2d 1214, 1224 (C.D. Cal.), *aff'd*, 114 F. App'x 921 (9th Cir. 2004). "Generic marks are
16 those that refer to the genus of which the particular product is a species." *One Indus., LLC*
17 *v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009) (citing *Two Pesos, Inc. v.*
18 *Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (internal quotation marks omitted)).
19 "Descriptive terms directly describe the quality or features of the product." *Brookfield*
20 *Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 n.19 (9th Cir. 1999). "A
21 suggestive mark conveys an impression of a good but requires the exercise of some
22 imagination and perception to reach a conclusion as to the product's nature." *Id.* "Finally,
23 arbitrary and fanciful marks have no intrinsic connection to the product with which the mark
24 is used; the former consists of words commonly used in the English language . . . whereas
25 the latter are wholly made-up terms." *Id.* (quotation marks and citation omitted).

26 Here, there is no dispute that Plaintiff's mark is arbitrary. (ECF Nos. 8 at 14-15, 17
27 at 14.) Thus, Plaintiff's mark is conceptually strong. *See, e.g.*, *Moose Creek*, 331 F. Supp.
28 2d at 1224.

12

### ii.   Commercial Strength

"Identifying whether a mark is generic, descriptive, suggestive, arbitrary or fanciful, however, is only the first step of the inquiry." *One Indus.*, 578 F.3d at 1164. "The second step is to determine the strength of this mark in the marketplace." *Id.* (citation omitted) Commercial strength is based on actual marketplace recognition, and thus advertising expenditures are often a sound measure of commercial success. *See Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011).

Plaintiff argues that, given its "30 years of commercial success, large list of prior customers, and constant advertising, the DeBell Mark is also commercially strong." (ECF No. 8 at 15.) Defendants counter Plaintiff's mark is weak because it only engages in local rather than national advertising, and spends much less money on advertising than Defendants do. (ECF No. 17 at 14-15.)

The Court finds Plaintiff's mark is somewhat commercially strong. As discussed *supra* as to Defendants' use in commerce argument, the Court credits the written and oral testimony of the D'Andreas as establishing that their mark is somewhat commercially strong in Reno, Nevada. Plaintiff has been in business for 30 years, has a customer list of over 7,500 prior customers, is on track to spend over $1 million in advertising this year alone, and obtains much of its business from generational word-of-mouth marketing, where parents pass DeBell's name onto their grown children when those grown children need, for example, their windows replaced. (ECF No. 7-1.) However, all of Plaintiff's proffered evidence of commercial strength goes to its commercial strength in Reno, Nevada. Defendants are a bigger business in other locations beyond Reno. (ECF No. 16-1 at 2 (explaining Defendants operate in 11 different states), 7-8 (indicating Defendants have won some awards and enjoy a generally positive reputation on online review sites), 8-9 (partially redacted) (indicating Defendants have spent many millions on advertising).) Regardless, because Plaintiff did not proffer any evidence of the commercial strength of its mark outside of Reno, Nevada, the Court finds Plaintiff's mark is merely somewhat commercially strong.

1    Overall, this factor favors Plaintiff because Plaintiff's mark is conceptually strong,

2    and somewhat commercially strong.

3         **b.      Factor 2: Proximity or Relatedness of the Goods**

4    "The standard for deciding whether the parties' goods or services are related is

5    whether customers are 'likely to associate' the two product lines." *Surfvivor Media, Inc. v.*

6    *Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005) (citation and remaining internal

7    quotation marks omitted); *see also Sleekcraft*, 599 F.2d at 350 (goods are related when

8    there is a likelihood that the consumer will "assume there is an association between the

9    producers of the related goods, though no such association exists."). "Proximity of the

10   parties' goods exists where they are (1) complementary, (2) sold to the same class of

11   purchasers, or (3) are similar in use or function." *Matrix Motor Co. v. Toyota Jidosha*

12   *Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1092 (C.D. Cal. 2003) (citing *Sleekcraft*, 599

13   F.2d at 350).

14   Plaintiff argues this factor weighs in favor of finding confusion because the parties

15   sell identical goods and services—in some cases even using the same subcontractors to

16   install the products customers purchase. (ECF No. 8 at 16.) While Defendants concede

17   that both parties sell and install windows, they argue their product line is distinct because

18   Defendants offer several exclusive lines of windows. (ECF No. 17 at 15.) Defendants also

19   counter that the parties do not use the same subcontractors, and offer affidavits from

20   several subcontractors stating they do not also work for Plaintiff.[6] (*Id.*)

21   ///

22   ///

23

24

25

26   _____

27       [6]Defendants also argue that Plaintiff falsely claims it sells products other than
     windows because it only has a license to install windows (ECF No. 17 at 15), but that
28   argument in unpersuasive in light of Plaintiff's reasonable reply that it uses licensed
     subcontractors to install products other than windows, such as roofing, siding, and
     bathtubs (ECF No. 21 at 11).

1    Regardless of whether Plaintiff and Defendants use the same subcontractors,[7] this

2    factor favors Plaintiff. Both Plaintiff and Defendants sell similar products to homeowners

3    looking to renovate their houses. Defendants' attempted distinction between the specific

4    windows they sell, and the specific windows Plaintiff sells, is a distinction without a

5    difference. Notably, Defendants do not proffer any legal authority to support their

6    argument—probably because no such authority exists. Moreover, and as Plaintiff points

7    out in reply, Defendants concede both Plaintiff and Defendants sell and install residential

8    windows in Northern Nevada, making them direct competitors in that particular market.

9    (ECF No. 21 at 11.) The Court's focus must be on "whether the consuming public is likely

10   somehow[,]" to associate Plaintiff's products with Defendants', and vice-versa. *Brookfield*,

11   174 F.3d at 1056. Considering that both parties sell and offer the same products in the

12   same geographical location—installation of windows in the Northern Nevada area—this

13   factor favors Plaintiff.

14                   **c.    Factor 3: Similarity of the Marks**

15       Courts consider "sight, sound and meaning to determine the similarity of

16   competing marks." *One Indus.*, 578 F.3d at 1162 (quotation marks and citation omitted).

17   "In considering the degree of similarity between the two marks, courts should analyze each

18   mark within the context of other identifying features." *Surfvivor*, 406 F.3d at 633.

19       Plaintiff argues this factor favors finding likely confusion because the words in

20   Plaintiff and Defendants' marks are both visually and phonetically similar, and they do not

21   have dissimilar meanings, because both words lack any inherent meaning. (ECF No. 8 at

22   15.) Plaintiff also argued at the Hearing the marks' phonetic similarity is particularly

23   important because much of their business is word-of-mouth. Defendants focus on the

24   visual dissimilarities between the two logos in arguing this factor does not favor finding

25   likely confusion—Plaintiff's has a window, while Defendants' has a butterfly—and highlight

26

27   _____

28       [7]Plaintiff proffers another affidavit along with its reply stating that one of their
     subcontractors overlaps. (ECF No. 21 at 11 n.22; *see also* ECF No. 21-1.)

1
2
the phonetic differences between the two—DaBella has two 'a' sounds, while DeBell does not. (ECF No. 17 at 15-17.) The Court again agrees with Plaintiff.

3
4
While the parties' logos (in Plaintiff's case, including the mark, whereas in Defendants' case, the logo is the mark) are not visually identical, they are similar:

5
6
7
8
   

9
10
11
12
(ECF No. 17 at 16.) Plaintiff's logo has a window, and dark green text with a yellow shadow and a 'shine' effect. Defendants' mark has simpler gray text with a butterfly. But both logos have some amount of green and gray, and both have a pictorial element to the viewer's left of the textual element.

13
14
15
16
17
18
19
20
21
22
23
24
The words in the two marks are more similar. By swapping two es for two as, one moves from DeBell to DaBella. They are also phonetically similar, especially considering that they both refer to home improvement businesses. The Court finds the phonetic similarity more important than the visual similarity here because Plaintiff's mark covers the word "DeBell" in any format or stylization, not just the logo. (ECF No. 7-4.) And especially given Plaintiff's proffered evidence that much of its business is word-of-mouth (ECF No. 7-1 at 4-5), a reasonable consumer could easily confuse DeBell for DaBella when trying to remember the name of a business someone told them about that will both sell you windows and then install them for you. Moreover, as Plaintiff argues, both words lack intrinsic meaning in the home-improvement context—neither word means anything.[8] Because the textual and phonetic similarity slightly outweighs the visual dissimilarity between the two marks, the Court finds this factor weighs slightly in Plaintiff's favor.

25
26
27
28
---

[8]It is uncontested that Plaintiff's owner came up with DeBell in consultation with a graphic designer, and it does not mean anything. (ECF No. 7-1 at 3.) It is similarly uncontested that Defendants' owners came up with DaBella by combining the names of their twins, David and Isabella, to indicate their business is family-focused. (ECF No. 16-1 at 2.)

#### d.      Factor 4: Evidence of Actual Confusion

Plaintiff proffers several examples of actual confusion, and therefore argues this factor weighs in its favor. (ECF No. 8 at 16.) Defendants respond this factor does not weigh in Plaintiff's favor primarily because Plaintiff's proffered instances of actual confusion are inadmissible hearsay, as they are described in the declarations of the D'Andreas (who, as Plaintiff's owners, of course have a financial stake in winning this case), instead of declarations from the actual customers. (ECF No. 17 at 17.) Plaintiff replies, "the Ninth Circuit has long held that, in trademark cases, a consumer's statement regarding confusion made to an employee is admissible under the state-of-mind exception." (ECF No. 21 at 2.) The Court agrees with Plaintiff.

The parties' arguments as to the admissibility of Plaintiff's consumer confusion evidence highlight a tension between *Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011), which suggests the Court can consider Plaintiff's proffered evidence, and *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110-11 (9th Cir. 2016) (affirming in pertinent part the Court's ruling the applicable statements were hearsay), which distinguished *Lahoti*, and suggests the Court may not. However, the Court finds Plaintiff's proffered consumer confusion evidence is more like the evidence found admissible in *Lahoti* than the evidence found inadmissible in *JL Beverage*. The *JL Beverage* court noted two distinguishing factors that made the actual confusion evidence admissible under the state of mind hearsay exception in *Lahoti* that were not present in *JL Beverage*: (1) the customers who were calling in (as reported in a company representative's declaration) were confused at the time they called, not after the fact; and (2) the declarant did not have a close personal relationship with the confused people. *See JL Beverage*, 828 F.3d at 1111.

Both of these factors apply to Plaintiff's proffered actual confusion evidence. The confused customers described by the D'Andreas in their declarations and testimony appear confused at the time those interactions occurred, and the D'Andreas do not appear

to have had a close personal relationship with them. The Court specifically discusses four of Plaintiff's proffered instances of actual confusion, which the Court finds admissible.

First, Mrs. D'Andrea describes, both in her declaration and in her Hearing testimony, a May 9, 2020 incident with a potential customer, Mr. Peters, where Mr. Peters told Mrs. D'Andrea he was unhappy with an estimate appointment he just had with one of Plaintiff's representatives. (ECF No. 7-2 at 3-4.) Because Mr. Peters had not yet had his estimate appointment with Plaintiff, Mrs. D'Andrea was able to deduce he actually had an appointment with Defendants, which she and Mr. Peters later corroborated by reviewing a copy of the contract Mr. Peters signed after the estimate appointment, which was with Defendants. (*Id.*) Mr. Peters appears to have been confused at the time he spoke with Mrs. D'Andrea on the phone, and there is no evidence tending to indicate he and Plaintiff and its employees have any personal relationship. The Court thus finds this incident with Mr. Peters is admissible under the state of mind exception to the hearsay rule. *See JL Beverage*, 828 F.3d at 1111; *see also Lahoti*, 636 F.3d at 509.

Second, Mrs. D'Andrea describes, both in her declaration and in her Hearing testimony, a May 13, 2020 incident with a potential customer named Mr. DeVay, where Mr. DeVay told Mrs. D'Andrea he was unhappy with an estimate appointment he had the previous day with Plaintiff. (ECF No. 7-2 at 4-5.) Because Plaintiff had not given an estimate to Mr. DeVay the day before, Mrs. D'Andrea was able to determine Mr. DeVay thought Plaintiff and Defendants were the same company. (*Id.*) Like Mr. Peters, Mr. DeVay appears to have been confused at the moment he called Mrs. D'Andrea, and there is no evidence tending to indicate he and Mrs. D'Andrea and Plaintiff have any relationship. The Court thus finds this incident with Mr. DeVay is also admissible under the state of mind exception to the hearsay rule. *See JL Beverage*, 828 F.3d at 1111; *see also Lahoti*, 636 F.3d at 509.

Third and fourth, Mrs. D'Andrea described at the Hearing a July 2, 2020 call with a potential customer named "Eileen or Irene" (*see* ECF No. 7-2 at 5-6; *see also* ECF No. 43 at 32-35), and an August 15, 2020 call with a potential customer named Lucy (ECF No.

43 at 33-35). These interactions were very similar to the interactions with Mr. Peters and Mr. DeVay described above, in that "Eileen or Irene" and Lucy appeared to have confused Plaintiff with Defendants, did not appear to be friends with Mrs. D'Andrea or have any relationship with Plaintiff, and the confusion played out in real time on the phone with Mrs. D'Andrea, the person who is testifying to the fact these interactions occurred. Thus, also similar to the interactions with Mr. Peters and Mr. DeVay, the Court finds the "Eileen or Irene" and Lucy incidents are also admissible under the state of mind exception to the hearsay rule.

In sum, Plaintiff has proffered at least four admissible incidents of actual confusion. This factor therefore also weighs in Plaintiff's favor.

### e.    Factor 5: Marketing Channels Used

Plaintiff further argues its marketing channels overlap with Defendants, weighing in favor of finding a likelihood of confusion. (ECF No. 8 at 16-17.) Plaintiff more specifically argues that both Plaintiff and Defendants have a website with similar domain names, both businesses rely on social media websites, review websites like Yelp, and in-person estimate appointments for customers. (*Id.*) Defendants respond that the fact both parties have an online presence alone is insufficient to demonstrate overlapping marking channels—because the internet is ubiquitous. (ECF No. 17 at 18 (relying on *Network Automation*, 638 F.3d at 1151).) Defendants further generally argue their advertising strategy is more digital than Plaintiff's, which relies on word of mouth, local circulars, signage, and television advertisements. (*Id.*) Defendants also state they rely on internet lead generators, Facebook, canvassing, and telemarking. (*Id.*) Plaintiff replies that it also uses internet lead generators—specifically including modernize.com, also used by Defendants—and Facebook. (ECF No. 21 at 11-12.)

The Court again agrees with Plaintiff. "Convergent marketing channels increase the likelihood of confusion." *Groupion, LLC v. Groupon, Inc.*, 826 F. Supp. 2d 1156, 1164 (N.D. Cal. 2011) (quotation marks and citations omitted). While the parties may not pursue identical marketing strategies, there is no real dispute that the marketing channels they

use significantly overlap. Both parties use internet lead generators, Facebook, have websites, and canvass to one degree or another, because both parties provide in-home estimates. (ECF Nos. 8 at 16-17, 17 at 18, 21 at 11-12.) The Court therefore finds that this factor also weighs in favor of finding a likelihood of confusion.

        **f.     Factor 6: the Type of Good and Degree of Care Likely to be Exercised by the Consumer**

Plaintiff argues this factor favors finding a likelihood of confusion because both parties market their products and services to unsophisticated homeowners, particularly Plaintiff, whose average customer tends to be older and not careful when buying windows. (ECF No. 8 at 17-18.) Defendants persuasively respond this factor weighs against finding likely confusion because new windows and roofing systems are expensive purchases. (ECF No. 17 at 18-19.)

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. What is expected of this reasonably prudent consumer depends on the circumstances:

> [w]e expect him [the reasonable consumer] to be more discerning – and less easily confused – when he is purchasing expensive items, *see, e.g., Official Airline Guides*, 6 F.3d at 1393 (noting that confusion was unlikely among advertisers when the products in question cost from $2,400 to $16,000), and when the products being sold are marketed primarily to expert buyers, *see, e.g., Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989).

*Brookfield*, 174 F.3d at 1060.

Defendants state, and Plaintiff does not argue otherwise, that the average price for new roofing in Nevada is over $20,000, and the average price for the installation of window systems in Nevada is over $12,000. (ECF No. 17 at 18-19 (partially redacted).) These prices are as high or higher than the prices discussed in *Brookfield*, 174 F.3d at 1060, which the Ninth Circuit found sufficiently expensive to create a presumption that a buyer would exercise care. Moreover, regardless of how sophisticated a particular customer is, it is common sense that customer would exercise care in making a major

1  purchase such as new windows, or a new roof, for their home. The Court therefore finds

2  this factor favors Defendants.

3          **g.**    **Factor 7: Defendants' Intent in Selecting the Mark**

4        "This factor favors the plaintiff where the alleged infringer adopted his mark with

5  knowledge, actual or constructive, that it was another's trademark." *Id.* at 1059 (citation

6  omitted).

7        While Plaintiff assumes in its Motion that Defendants selected their mark with an

8  intent to confuse (ECF No. 8 at 18-19), Defendants persuasively respond that their owners

9  chose their name by combining the names of their children back in 2011 (ECF No. 17 at

10  19-20). Defendants were not aware of Plaintiff or its mark until after the parties' interactions

11  as discussed *supra*. And as Defendants argue, Plaintiff's argument regarding its' co-

12  owners Yelp conversation with one of Defendants' employees is beside the point because

13  it does not go to Defendants' intent in selecting their mark. (*Id.*) Plaintiff does not otherwise

14  address this factor in its reply. (ECF No. 21.) Thus, the Court finds this factor also favors

15  Defendants.

16          **h.**    **Factor 8: Likelihood of Expansion**

17        When the goods or services of the parties are related, this factor is irrelevant. *See*

18  *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1029 (9th Cir. 2004).

19  Indeed, here, Plaintiff concedes this factor is irrelevant because both parties offer the

20  same products and services in the same market. (ECF No. 8 at 19.) And Defendants do

21  not address this factor. (ECF No. 17.) The Court therefore finds this factor irrelevant.

22          **i.**    **Balancing the Factors**

23        On balance, the *Sleekcraft* factors favor finding a likelihood of confusion.

24  Specifically, the first through fifth factors favor finding a likelihood of confusion. *See supra.*

25  The sixth and seventh factors weigh against finding a likelihood of confusion, and the

26  eighth factor is irrelevant. *See id.* But especially considering that "actual confusion is at

27  the heart of the likelihood of confusion analysis[,]" *Playboy*, 354 F.3d at 1027, the

28  *Sleekcraft* analysis leads the Court to conclude Plaintiff has made a sufficient showing of

1  likelihood of confusion at this preliminary injunction stage. The Court accordingly finds

2  Plaintiff is likely to prevail on the merits of its trademark infringement claims. *See Grocery*

3  *Outlet*, 497 F.3d at 951 (stating a plaintiff is likely to prevail on the merits where it owns a

4  valid trademark and "the alleged infringer is using a confusingly similar mark"). The DeBell

5  and DaBella marks are confusingly similar, especially considering Plaintiff and Defendants

6  both offer interchangeable products and services in Northern Nevada.

7       **D.  Likelihood of Irreparable Harm**

8       That said, to prevail on its Motion, Plaintiff must establish that "remedies available

9  at law, such as monetary damages, are inadequate to compensate for that injury." *eBay*

10  *Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). That is, Plaintiff must establish

11  that the harm caused by Defendants cannot be remedied except through injunctive relief.

12  *See MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007).

13       Defendants fit their laches argument into this prong of the preliminary injunction

14  analysis. (ECF No. 17 at 6-9.) However, as explained above, the Court finds that argument

15  unpersuasive. Accordingly, it has no impact on this prong of the analysis.

16       Turning to the parties' other arguments on this prong, Plaintiff argues that

17  "Defendants' use of the DaBella mark is likely to damage DeBell's long-cultivated

18  reputation, limit DeBell's ability to control its own reputation, divert DeBell's prospective

19  customers to DaBella, and devalue DeBell's longtime marketing efforts. These kinds of

20  harms cannot be quantified, and they cannot be remedied with money damages." (ECF

21  No. 8 at 19; *see also id.* at 19-21.) Defendants primarily respond Plaintiff has not presented

22  sufficient evidence of irreparable harm. (ECF No. 17 at 9-12.) The Court agrees with

23  Plaintiff this factor also favors issuing a preliminary injunction.

24       Plaintiff's most persuasive argument as to this factor is that, by moving into the

25  Reno market with a confusingly similar name to Plaintiff's senior, registered, trademarked

26  name, Defendants are limiting Plaintiff's ability to control its own reputation. As explained

27  *supra* as to likelihood of confusion, the Court credits four instances of actual confusion

28  proffered by Plaintiff where potential customers could not tell Plaintiff and Defendants'

22

businesses apart. More specifically, in the case of Mr. Peters, he decided not to do any business with Plaintiff after his negative experience with Defendants. (ECF No. 7-2 at 3-4.) While it is impossible to say whether he would have done business with Plaintiff in the absence of his negative interaction with Defendants, his negative interaction with Defendants meant he never gave Plaintiff a chance. (*Id.*) This is an example of actual harm. *See Herb Reed*, 736 F.3d at 1249 ("actual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action").

Moreover, as also discussed *supra*, the evidence regarding both parties' marketing and advertising expenditures suggests that Defendants are a much bigger business than Plaintiff, who spend much more on marketing and advertising. Logically, that fact implies that instances of actual confusion like those discussed *supra* will continue to occur. Said otherwise, assuming Defendants continue to spend much more than Plaintiff on marketing and advertising in Reno, more people will be unable to tell the difference between DeBell and DaBella going forward. Plaintiff's argument it is losing control of its own reputation is therefore both persuasive and supported by the evidence before the Court. (*Compare* ECF Nos. 7-1, 7-2 (describing Plaintiff's marketing spend and instances of actual confusion) *with* ECF No. 19-1 (sealed) at 8-9 (stating Defendants have spent amounts on marketing and advertising totaling a larger expenditure than Plaintiff).) *See also Herb Reed*, 736 F.3d at 1250 ("Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."); *see also 2Die4Kourt v. Hillair Capital Mgmt., LLC*, 692 F. App'x 366, 369 (9th Cir. 2017) (finding "evidence showing that [the defendant] used the [plaintiffs'] trademarks after the termination of the Agreement to release an unapproved line of cosmetics products" was "enough to support a finding, at this early stage, that the [plaintiffs] likely will lose some measure of control over their business reputation in the absence of injunctive relief.").

Defendant contends this case is like *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) in arguing that Plaintiff cannot show irreparable harm because its "allegations of harm in the record are conclusory and speculative[.]"

(ECF No. 17 at 11-12.) However, as generally discussed *supra* as to the four instances of actual confusion the Court credits, and more specifically as to the incident involving Mr. Peters, the Court finds that Plaintiff's allegations of harm are neither conclusory nor speculative. Mr. Peters had a bad experience with one of Defendants' representatives and subsequently declined to do business with Plaintiff. (ECF No. 7-2 at 3-4.) At least in that one instance, Mr. Peters' actual confusion regarding the two businesses harmed Plaintiff. The Court thus finds Defendants' argument based on *Titaness Light Shop* unpersuasive,[9] and more generally finds the irreparable harm prong also favors granting Plaintiff's Motion.

### E. Balance of the Hardships

Moving to the next prong of the preliminary injunction analysis, Plaintiff argues the balance of the hardships favors Plaintiff because Defendants are benefitting from Plaintiff's hard-earned reputation through their infringing conduct. (ECF No. 8 at 21-22.) Defendants respond this factor favors them because they will face substantial hardship if the Court grants Plaintiff the overbroad injunction it requests here, primarily the expense associated with rebranding. (ECF No. 17 at 21.) The Court finds Defendants' arguments persuasive, but, as further explained *infra*, finds they can be addressed by limiting the scope of the injunction. Moreover, the Court finds this factor nonetheless favors Plaintiff.

"In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987); *see also Int'l Jensen v. MetroSound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises."). But when, as here, the

---

[9]Defendants also argue that Plaintiff has harmed its own reputation, citing negative online reviews. (ECF No. 17 at 11.) That argument is beside the point. Whether Plaintiff has harmed its own reputation is irrelevant to the irreparable harm analysis, though evidence as to whether Defendants have harmed Plaintiff's reputation is. And the Court otherwise declines to separately address Defendants' other unpersuasive arguments raised in this portion of their briefing. (*Id.* at 9-12.)

24

1   defendant argues it will be harmed if an injunction issues, if "the harm complained of

2   results from a defendant's allegedly infringing conduct, [the Ninth Circuit has] nonetheless

3   approved the entry of a preliminary injunction." *2Die4Kourt*, 692 F. App'x at 369 (citation

4   omitted).

5       The Court reiterates it is sensitive to Defendants expressed concerns about the

6   impact of an injunction on their business, considering the evidence suggests that

7   Defendants are a bigger business then Plaintiff, they did not select their confusingly similar

8   mark with ill intent, and Plaintiff has not presented any evidence of awareness of its brand

9   outside of Reno, Nevada and the surrounding area. The issue for Defendants is that the

10  Court has found the likelihood of confusion analysis suggests Defendants' junior DaBella

11  mark infringes Plaintiff's senior DeBell mark. And as noted, the Ninth Circuit has

12  sanctioned injunctions even when they effectively put defendants out of business if those

13  defendants are infringing the plaintiff's marks, finding the balancing of the hardships

14  nonetheless favors the plaintiffs. *See 2Die4Kourt*, 692 F. App'x at 369. Because the Court

15  has found a likelihood of confusion here, the Court accordingly also finds the balance of

16  the hardships favors granting an injunction here, particularly given the Court's curative

17  limit on the scope of Plaintiff's requested injunction *infra*.

18      **F.  Public Interest**

19      On the fourth and final prong of the preliminary injunction analysis, Plaintiff argues

20  the public has a strong interest in avoiding confusion in the marketplace, so the Court

21  should issue a preliminary injunction to protect consumers from confusion during the

22  pendency of this case. (ECF No. 8 at 22.) Defendant responds, "[b]ecause the marks are

23  not similarly confusing, no public interest would be served by granting a preliminary

24  injunction." (ECF No. 17 at 22.) Defendant further reiterates Plaintiff's requested injunction

25  is overbroad. (*Id.*) Especially considering the Court has already rejected the predicate of

26  Defendant's primary argument, the Court agrees with Plaintiff.

27      Courts "must consider the public interest as a factor in balancing the hardships

28  when the public interest may be affected." *Caribbean Marine Servs. Co. v. Baldridge*, 844

F.2d 668, 674 (9th Cir. 1988). "In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused." *Cytosport v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009). Said otherwise, "[a]n injunction that seeks to prevent confusion to consumers in a trademark case is in the public interest." *Traeger Pellet Grills, LLC v. Dansons US, LLC*, 421 F. Supp. 3d 876, 890 (D. Ariz. 2019), *appeal dismissed,* Case No. 19-17211, 2020 WL 470307 (9th Cir. Jan. 8, 2020) (citations omitted).

Again, because the Court has found a likelihood of confusion *supra*, this factor also favors Plaintiff. *See Cybergun, S.A. v. Jag Precision*, Case No. 2:12-CV-0074-KJD-GWF, 2012 WL 4868104, at *8 (D. Nev. Oct. 11, 2012), *aff'd sub nom. Cybergun S.A. v. Jag Precision, Inc.*, 533 F. App'x 791 (9th Cir. 2013) ("The public interest favors a preliminary injunction where there is a likelihood of confusion."). The marks at issue here are confusingly similar. *See supra* Section III.C.1. Thus, the public will benefit from an injunction that seeks to prevent confusion. *See Traeger*, 421 F. Supp. 3d at 890.

### G. Weighing the Factors

All four preliminary inunction factors favor Plaintiff. The Court will therefore grant Plaintiff's Motion, but will limit the scope of the requested injunctive relief.

### H. Scope of Injunction

The Court agrees with Defendants that Plaintiff's requested injunction is overbroad because Plaintiff has not proffered any evidence it has substantial operations or brand awareness outside the Northern Nevada area. In contrast, Defendants have presented evidence they have substantial operations spanning 11 states, and have invested significant resources into developing the DaBella brand. (ECF No. 19-1 (sealed).) Thus, issuing an injunction covering the 11 states in which Defendants do business, or that otherwise impacted Defendants' entire, national website would be inequitable.

As suggested at the Hearing, the Court finds the most equitable way to resolve this tension surrounding the scope of Plaintiff's requested injunction is to require Defendants to use a disclaimer applicable only to their operations in Northern Nevada (from Hawthorne

north) while this case is pending. The parties addressed the potential use of a disclaimer both at the Hearing and in their supplemental briefing. (ECF Nos. 33, 39.) At the Hearing, Plaintiff stated it was amenable to a more limited injunction than the injunction requested in its briefing; specifically, one limited to Northern Nevada (north of Hawthorne) in which Defendants would be required to remove or rebrand only the 'Reno' page on their website, and rebrand their Northern Nevada operations to something not confusingly similar to DeBell. (ECF No. 43 at 114-115.) In its supplemental briefing, Plaintiff argues a disclaimer is a disfavored remedy that the Court should only consider if Defendants can meet a heavy burden of showing the disclaimer will not lead to more consumer confusion. (ECF No. 33.) Defendants respond they are amenable to a disclaimer, argue the Court has discretion to fashion appropriate relief, and argue Plaintiff's proffered cases apply in the permanent injunction context, but not necessarily in the preliminary injunction context. (ECF No. 39.) The Court agrees with Defendants.

To start, the Court agrees with Defendants it has discretion to fashion appropriate injunctive relief here. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-05 (1988) ("traditional equitable principles requiring the balancing of public and private interests control the grant of declaratory or injunctive relief in the federal courts."). Further, the Court may consider Defendants' arguments regarding the hardships they will face if they are required to change their name from 'DaBella' in fashioning relief. *See Sardi's Rest. Corp. v. Sardie*, 755 F.2d 719, 726 (9th Cir. 1985) ("Although the relative size of the respective businesses is not a defense to a suit for a permanent injunction, it is certainly relevant to the potential hardship from changing a business' name.") (internal citation omitted).

Moreover, Defendants' proffered hardships were they required to change their name—as Plaintiff requests—are significant, and therefore weigh in favor of adopting the disclaimer approach. *See, e.g.*, *Philip Morris Inc. v. Cigarettes For Less*, 215 F.3d 1333 (Table), 2000 WL 369542, at *2 (9th Cir. 2000) (holding the district court did not abuse its discretion in adopting a disclaimer approach in a preliminary injunction over the plaintiff's objection in a trademark case after considering the parties' relative hardships and finding

1   the plaintiff's requested injunctive relief would effectively put at least some of the
2   defendants out of business). Defendants' President says it would cost well over a million
3   dollars and take a few years to successfully rebrand. (ECF No. 19-1 (sealed) at 8-9.)
4   Conversely, and as repeatedly noted, Plaintiff did not proffer any evidence suggesting its
5   brand is well-known anywhere outside of the Reno, Nevada area. Further, a disclaimer
6   would not impose any hardship on Plaintiff. Defendants' arguments regarding the
7   hardships associated with rebranding are therefore well-taken.

8        Perhaps more importantly, requiring Defendants to use a disclaimer would mitigate
9   consumer confusion. *See Philip Morris*, 2000 WL 369542, at *2 (affirming on abuse of
10  discretion review the imposition of a disclaimer intended to remedy consumer confusion).
11  The four instances of actual confusion the Court found admissible *supra* are instances
12  where customers could not tell the difference between Plaintiff and Defendants. By
13  requiring Defendants use a disclaimer, any customers that go to Defendants first will
14  quickly learn there is a difference between Plaintiff and Defendants. To this point, Plaintiff
15  argued at the Hearing that a disclaimer would be insufficient because customers
16  attempting to find DeBell, but not able to remember its name, would search for something
17  online like DeBell and may well find DaBella instead—and then use DaBella instead of
18  DeBell after they found DaBella's contact information. (ECF No. 43 at 122.) The Court is
19  unpersuaded. If someone was looking for DeBell, but they landed on DaBella's Reno
20  website, a prominent disclaimer saying DaBella is not DeBell would resolve their
21  confusion.

22       In sum, the Court finds that using a disclaimer—as more specifically outlined in the
23  conclusion of this order—will appropriately limit the scope of the preliminary injunction
24  Plaintiff has shown it is entitled to. Plaintiff is the senior user, Defendants' mark is
25  confusingly similar, but Plaintiff has only shown it operates in the Reno, Nevada area.

26  **I.  Bond**

27       The Court will not require Plaintiff to post a bond. Defendants stated they would
28  stipulate to waiving the bond requirement if the Court only imposed a disclaimer on their

website, but also suggested they would be amenable to waiving the bond requirement so long as the Court did not impose anything beyond a disclaimer. (ECF No. 39 at 4, 4 n.1.) Thus, Defendants' opposition to a waiver of any bond is at least not so strenuous. Moreover, as Plaintiff argues (ECF No. 8 at 22), because the bond requirement exists to protect Defendants against the issuance of a wrongful injunction (*see* Fed. R. Civ. P. 65(c)), and the Court has found Plaintiff likely to prevail on the merits (*see supra* Section III.C.1.), a bond is unnecessary here. Thus, the Court will not require Plaintiff to post a bond.

## IV.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Plaintiff's motion for preliminary injunction (ECF No. 8) is granted in part, and denied in part, as further specified below. Pending resolution of this case on the merits, Defendants must:

1. Use a prominent disclaimer stating they are not DeBell Window Systems, Inc.—and provide Plaintiff's phone number in that disclaimer ((775) 826-6444)—at the outset of every interaction Defendants have with potential customers in Northern Nevada, defined as the entire geographic area within the State of Nevada from Hawthorne north.

2. The disclaimer must appear on the web page https://dabella.us/location/reno/, and any other web page controlled by Defendants that exclusively addresses Defendants' Reno, Nevada location.

3. The disclaimer must also appear on any and all printed materials given by Defendants' representatives to customers or potential customers in Northern Nevada.

///

///

4.  Defendants' representatives must also include the disclaimer at the beginning of any and all marketing or canvassing scripts Defendants prepare for use in Northern Nevada.

5.  Defendants' representatives must also say the disclaimer at the beginning of any and all in-person or telephonic interactions between Defendants' representatives and customers or potential customers in Northern Nevada.

It is further ordered that any and all disputes about this disclaimer that arise while this case is pending—whether to form, usage, content, or otherwise—are referred to U.S. Magistrate Judge William G. Cobb.

It is further ordered the parties must meet and confer in an attempt to resolve any disclaimer disputes before bringing them to Judge Cobb.

It is further ordered that Plaintiff's motion for leave to file additional evidence in support of its motion for preliminary injunction (ECF No. 35) is denied.

DATED THIS 21st Day of September 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE